16 or 65 people who say, I don't know, I have to leave. I just Robert I mean, I'm sure he wore a wife, but that makes it even better because I know I didn't say anything. That is what Robert Goldsmith said after learning he had been charged in this case. Your honor to me, please report. My name is Emily Rosa and I was an assistant appellate defender with the State Appellate Defender's Office representing Robert Goldsmith in this appeal. On October 5th, 2000, Robert Goldsmith was charged with solicitation of murder for hiring. The basis for this charge was an alleged conversation between Goldsmith and his fellow Will County inmate, Brian McDaniel on October 3rd, 2012, while McDaniel was wearing a wire. The state alleged that during that conversation, Goldsmith and McDaniel agreed that McDaniel would kill Goldsmith's ex-wife, Becky, in exchange for $5,000. Goldsmith denied ever having such a conversation and maintained that the incriminating portions of the wire were faked by McDaniel posing questions to himself and whispering in response. McDaniel testified that the alleged conversations took place over by the October 3rd, he remained seated in his chair in the television area along with other inmates. A surveillance video of the night in question shows a man with Goldsmith's physical characteristics grabbing a chair and sitting under an overhang. When the timestamp on the video is removed, a white piece of paper the man is holding provides enough contrast to discern that the man is seated in the chair and remains there the entire time the inmates are out of their cells. The video was entered into evidence at trial, but Goldsmith did not testify to his location on the video because he only discovered after trial that the timestamp box could be removed. Goldsmith requested Judge Rozak reopen the case so he could identify himself on the video, but Judge Rozak refused and thus precluded consideration of the most definitive evidence of Mr. Goldsmith's innocence. Accordingly, this court cannot consider the video and determine whether the state met its burden to prove Goldsmith guilty. However, this court can consider the wire recording itself, and, like the video, the wire recording demonstrates the incriminating conversations were fabricated. The recording demonstrates that McDaniel knew he could fake a conversation in the phone area without being recorded by the security cameras. About four minutes into the wire recording, as he's being walked back to his cell, McDaniel asks the guard escorting him, So you can't see the phones at all? And the guard responds, Moreover, there are several instances where McDaniel's testimony, either to the grand jury or during trial, is contradicted by the recording itself. McDaniel testified that Goldsmith spoke freely about wanting his wife killed, that he was always talking about it as the first thing on his mind. But on the wire recording, McDaniel tells the detectives that Goldsmith is a little skittish and that he and McDaniel will do what he can. McDaniel also testified that he and Goldsmith both started talking and, quote, ended up at the phones, which were empty. McDaniel testified that he and Goldsmith each picked up a phone and pretended to be on it. But on the recording, the phones are not empty. When McDaniel walks up to the phones, he says, I didn't know you were in here, Charlie. I thought the phone was open. Charlie does not acknowledge Goldsmith or otherwise indicate that McDaniel is with another person. Instead, Charlie asks McDaniel if he has any extra minutes, and McDaniel gives him a five-minute phone call. At this time, around 3229 in the wire recording, a third person, who is not Goldsmith, McDaniel, or Charlie, can be heard talking on the phone in the background. There were only three phones in D-Pod. McDaniel also testified at the grand jury that he gave Goldsmith his phone number, his email address, and his girlfriend's phone number so that Goldsmith could make the payment arrangements. None of this information is on the recording. Based on this and the other inconsistencies outlined in my brief, the recording demonstrates that this alleged conversation simply didn't happen the way McDaniel said it did. What McDaniel says on the wire simply doesn't make sense in the context of what he claimed was happening. And McDaniel told other inmates that he was going to set up Goldsmith by faking a whispered conversation on the recording. And as the recording itself demonstrates, it's precisely what happened here. And accordingly, I request that your honors reverse Mr. Goldsmith's conviction outright. In the alternative, this court should grant Mr. Goldsmith a new trial. Judge Rozette's failure to grant Goldsmith's motion to substitute judge as a matter of right rendered all subsequent proceedings, in this case void. Under 725 ILCS 5-114-5A, a defendant has an absolute right to a substitution of judge if, within 10 days of the judge being assigned to the case, the defendant files a written motion naming the judge and alleging that the judge is still prejudiced against the defendant, that the defendant can't receive a fair trial. Here, it's undisputed that Mr. Goldsmith filed such a motion naming Judge Rozette, and it's undisputed that Rozette struck the motion. This was improper, and Judge Rozette's continued oversight of the proceedings rendered them void. The state argues that Rozette properly struck Mr. Goldsmith's motion because it was filed pro se at a time when Mr. Goldsmith was represented by the public defender. But the only reason Mr. Goldsmith was represented by counsel at the time the motion was filed was because Rozette improperly denied Mr. Goldsmith the right to go pro se. Filing the motion pro se was the only way for Mr. Goldsmith to protect his right to have Rozette automatically substituted. Yes, it was Mr. Goldsmith's right, and not his attorney's, to file that motion. On October 17th, the public defender made clear that she couldn't accommodate Mr. Goldsmith's request to file a motion to have Judge Rozette automatically substituted. Goldsmith then requested to go pro se, informing Judge Rozette that he wished to do so because he was looking into private counsel, wished to private counsel within the time frame to file that motion, and the public defender would not file that motion for him. Judge Rozette took Goldsmith's request to have him substituted as a personal affront, and expressed concern that Goldsmith would share with other inmates how to have Rozette removed from their cases. Rozette told Goldsmith that his purpose in going pro se was to file a motion to have Rozette substituted. Then the reasoning was, quote, only to frustrate the ends of justice, and Rozette didn't have to grant the request to go pro se. This was improper. Once Goldsmith articulated that he wished to proceed pro se, Rozette's only concern should have been whether Goldsmith was knowingly and intelligently waiving his right to have counsel appointed to assist him. But Rozette denied this request, not because it was made unknowingly or unintelligently, but because Goldsmith wished to assert his right to have Rozette substituted. Judge Rozette denied Goldsmith's request to go pro se with the conscious objective to thwart Goldsmith's attempt to have him substituted. Goldsmith had an absolute right to have Rozette substituted, and he did everything in his power to preserve that right. Judge Rozette was obligated to grant the motion to substitute, and his failure to do so while continuing to preside over Goldsmith's case rendered all subsequent proceedings void. Accordingly, in the event this Court does not reverse this conviction outright, Mr. Goldsmith respectfully requests that Your Honors reverse his conviction and command the trial court for further proceedings on this issue and the others raised in the brief. Your Honors, don't you have any more questions? I have none, and I think we're okay. Thank you. Good afternoon, Your Honors. May it please the Court? Counsel? Well, Your Honors, the State submits that the trial court was the trier that, in this case, this was a bench trial, the trial court heard the testimony, heard the evidence, heard the wire recording, watched the video, the court was in the only position to make the credibility determinations, weigh the evidence, and come up with the verdict. The trial court considered everything, made the verdict, and any rational trial fact could have found the defendant guilty of solicitation to commit murder, just like the trial court did. The State submits and stresses that this is not a new trial. Your Honors, this Court's duty is not to start from scratch and try to defend over. The trial court, again, was in the best position to consider the evidence and record of murder, and the evidence presented supports that verdict. I think the record is very clear that the defendant had animosity towards his wife or ex-wife. I don't remember if the divorce was final at that point, but Brian Daniel testified that he was still mad at Victoria Smith, his wife, and mentioned it all the time. Of course, the record shows that the reason the defendant was in jail in the first place was because he attacked his wife in the hallway of the courthouse during a briefing of divorce proceedings. He even said, or was overheard saying, I wish I did more in that attack. Victoria Smith, his wife, or ex-wife, testified that the defendant still calls and harasses her, even from jail. And, of course, this is what the State submits, as I discussed in my brief, the most important and critical information on the topic of the defendant still having it out for his wife or ex-wife, is that while in jail, the defendant solicited three men in April and May of 2011 to kill Victoria Smith. The defendant represented himself. He stipulated to that fact. So it is not even in debate that the defendant solicited, had already solicited three people to kill his wife. Victoria Smith testified conclusively that that was the defendant's voice over her on a wire recording talking to Brian McDaniel. She said she was married to him for a long time. She knew his voice. She knew his whisper. The State would submit that she was in a much better position to identify his voice and his whisper than all of the witnesses that the defendant presented who testified that that was not his voice. Those people did not know the defendant like Victoria did. That was strong evidence that the defendant was the one heard soliciting Brian McDaniel on the phone. The State submits that even if the defendant did know that Brian McDaniel was the type of person who could wear a wire, the State submits that that's why the defendant whispered to McDaniel to disguise his voice. We could hear the defendant's voice on the recording earlier talking in his normal voice and he has a high-pitched, a fairly distinctive voice, the State would submit. He knew that would be identifiable pretty clearly on the recording. That's why he whispered. That's the State's submission. The State also submits that if he thought that Brian McDaniel was the type to wear a wire, that he was going to wear a wire, that's why he wouldn't give the McDaniel a need to commit the crime because, again, he said that if he thought he was wearing a wire, why would he go into great detail? If he thought he was wearing a wire, why would he talk to him? Because he knew McDaniel was getting out soon. At the beginning of the wire recording, Brian McDaniel, when they got out of their cells, he presented to the defendant and presumably others that he was getting out and they were talking about the detail of him leaving and so the State would submit that this was probably one of the last times that the defendant would get to ask McDaniel to do this crime because McDaniel wasn't going to be in jail anymore and so he would be free to commit the crime when he was out and if he was out, he couldn't solicit him anymore. So that's what the State submits. That's why it's reasonable to assume that's why the defendant did it at that point. So in conclusion on that issue, the State submits that an irrational charge given the evidence presented could have convicted the defendant on solicitation to commit murder. Issue two, substitution of judge. As the State argued in the brief, this motion was not properly filed. Clearly the defendant was represented by counsel. The defendant is not allowed to file motions once he's represented by counsel. That's pretty clear. And the State also submits that the record reflects that the only reason the defendant was moved to withdraw, had his counsel withdrawn, is to specifically file the motion to remove Judge Rozak. He even says in the record on page 17 of the common law record that he said he voiced an oral motion to represent himself for the purpose of filing the motion to remove Rozak. So the State submits. I think it does sound like he's trying to frustrate justice by getting rid of his attorney. And the State submits that it was likely that he would have reapplied for the public defender because I think it was clear after both motions were not granted by Rozak, the plaintiff continued to have counsel for two more years after that. So the State submits that Judge Rozak was, his hunch or his inkling was correct, that the defendant really was going to get rid of his attorney, get rid of Rozak as well, and then reapply for the public defender. And the State would submit that the purpose of a motion is only to frustrate justice. Well, whether it frustrates justice depends on where you break into the circle. Does the State agree that Mr. Goldsmith had an absolute right substitution of judge? Yes, at that point in time, yes. So was Judge Rozak frustrating justice when he denied him leave to get rid of his attorney so he could file the motion? Well, I think the defendant could, and you should argue that his counsel frustrated justice. He had an attorney, and the attorney, he voiced his displeasure with Judge Rozak to the attorney, and the attorney refused to file that motion. We don't know why. There could have been a legitimate reason for that. But the point is that he had an absolute right to have a change of judge. Yes. His attorney wouldn't file the motion. His only alternative was to seek substitution of the judge. His only alternative was to file the motion, per se. That was his only alternative, yes. Okay. So Judge Rozak prevented him from doing that? Because the judge thought that he was going to manipulate the system to get rid of his attorney and then reapply just to get things the way he wanted them done. I understand he had a right to the alternate goal, but I understand your question. And what's the response to that? I guess I don't have a great one. So I'm not going to try and fabricate a great one. But this thing will only submit that it appears. I think the record is pretty strong that the judge was correct and that the defendant was going to reapply for a public offender, and that would be, I don't want to say toying with the public offender, and that would be an appropriate use of that office. But I think that's what the judge thought that the defendant was doing, and he tried to prevent him from doing that. And the public defender putting him in the position of having to do that? But again, we don't know why the public defender wouldn't let the defendant file his motion. Maybe there was a reason. Maybe this isn't the proper forum for this issue. Maybe we need to hear from the public defender as to why they wouldn't allow the defendant to file that motion, or wouldn't file that motion on the defendant's behalf. Yeah, maybe there's not enough on this record. There was a defendant judge on another case involving Mr. Goldsmith, right? Yes, yes, he was. And he was worried about prejudice? He, yeah, he probably was worried about prejudice. Whether that was the motive or not, we don't know according to this record. But yeah, that's probably what he was thinking. I'm going to assume so. You're going to say it was this judge on Mr. Goldsmith? I believe that's correct. I'm almost positive, yes. Are there any other questions? Did Judge Schoenstatt take the waiver of jury? Or was it a different judge that allowed the defendant to waive a jury? Oh, that's not correct. You think that's incorrect? That's not correct. I don't recall that specific interchange. The reason for my question is he gave up his right to a jury trial, and that suggests he's not trying to frustrate justice. But the trier of fact, once you waive a jury trial, is pretty important, the personality. So that's why I asked that question, and I also understand why you didn't have an answer to Justice McCain's question. I appreciate he can't change the facts. He can't change the facts. In hindsight, I was learning things from my previous briefs that I wish I would have done differently, and I looked at the issue of his jury waiver. That certainly would imply that he was okay with a judge having an entire jury. I appreciate your answer. Thank you. Are there any other questions? Yes, ma'am. Thank you, Mr. Rolton. Mr. Rolton. Okay. First, I want to make something very clear. Mr. Rolton absolutely did not stipulate that he solicited three other men. That is not what the stipulations were. He stipulated that they would testify to that fact. He did not stipulate to that that would have happened. He, in fact, vociferously denied that those solicitations had ever happened. That's something I want to make very, very clear. Second, none of that matters if the reporting is fabricated, as the reporting itself suggests. Since no one solicits a snitch they think is trying to set him up, and the state, in their brief, conceded that Goltz knew or suspected that McDaniel was a snitch. Nobody solicits a snitch they think is trying to set them up. And on the second issue, it doesn't matter why the public defender wouldn't file the motion. That absolutely does not matter. The right to file the motion was the defendant's, not the attorney's. It was the defendant's decision through and through, not his attorney's. So why the public defender wouldn't file it is irrelevant. And I would also disagree with counsel's assertion that the record, you know, shows that Mr. Goltz would have asked for the public defender back. In fact, this is what happened. After he asked to go pro se, and Roszak said no, he said, Roszak said, and then what? You're going to ask for the public defender back and then you know what will happen? And Goltz says no. Roszak says take a guess. Goltz says it's going to be denied. Goltz knew that if he had asked for the public defender back, that it wasn't guaranteed that that would happen. And it was then with Roszak's discretion to deny that, because that is indeed what he was worried about. But he would have had a new judge. What was that? He would have had a new judge. That's true, but it also would have been within the discretion of that trial court, like within that judge, to reacquaint the public defender. And again, he said he wanted to go pro se in part because he was looking for private counsel, didn't know if he would be able to find private counsel within the time frame to file the motion. He wasn't trying to frustrate the ends of justice here. He was doing the best he could to assert his absolute right, have Judge Roszak substitute it in this case. And in terms of whether or not Judge Schoenstadt took the jury waiver, I do not believe that that is correct. I believe that it was Judge Roszak that took the jury waiver. And the record demonstrates that in part the reason why Mr. Goldsmith waived his right to a jury trial was for expediency. The state had agreed to stipulate to some things, and the state agreed to reveal what they would have brought out about some other phone calls and stuff that had happened after the events in this case that they wanted to present their case in chief. The state agreed to limit it to certain things so that Mr. Goldsmith didn't have to prepare even more on top of this while he was incarcerated. Do you know where the 2010 aggravated battery was in the process? Because the statement of facts suggests to me that the defendant had some experience with Judge Roszak. Yes, so at that point, once the state elected to proceed on the solicitation case, and if not, they had actually first elected to go forward on the aggravated battery case, but then something switched, and they elected to proceed on the solicitation case first. Was there a jury waiver in that case? No, that was a jury trial. Well, that might be your reason. Perhaps, but I believe that that, I might be getting confused. There was a lot of overlap. All right, I'll look at the record. Yes, and with that, I don't know if you have any more questions. Thank you very much, Ms. Goldsmith. Thank you both for your arguments and your sincere thoughts about what was going on in this case. It was very interesting. We're going to take this matter under advisement. The fact that you have written this petition is an assurance.